**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**MARIE KING**                                                                          **PLAINTIFFS**


**v.**                                      **CASE NO. 4:05-CV-1356 GTE**


**ARKANSAS CHILDREN'S HOSPITAL**                                        **DEFENDANTS**


<u>**ORDER ON MOTION FOR SUMMARY JUDGMENT**</u>

Presently before the Court is Defendant's Motion for Summary Judgment.

**I.      Background**

At the time of her discharge, Plaintiff Marie King, an African-American female, worked

as a medical secretary in Arkansas Children's Hopsital ("ACH") in the Ear Nose & Throat

("ENT") Clinic.[1]  At the time of her termination, Plaintiff King was assigned to assist Dr. Lisa

Buckmiller with administrative duties and was supervised by Tammy Webb.[2]  Ms. Webb was the

Director of the ENT and Eye Clinics at ACH, and reported to Carol Graham, Vice President of

Ambulatory Services.[3]  On July 19, 2005, Ms. Webb received a complaint from Sandra Steinert,

the Project Coordinator for Ambulatory Care Services, that Plaintiff's blouse was too low cut.[4]

Thereafter, Plaintiff received a voicemail from Tammy Webb regarding the alleged visible

---

[1]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact.

[2]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact.

[3]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact.

[4]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact.

cleavage.[5]  Plaintiff called Ms. Webb back because she wanted to go to Ms. Webb's office to discuss the matter further.[6]

During the meeting in Ms. Webb's office, Plaintiff King asked "So you are honestly telling me that you can see down in my blouse with me standing in front of you."[7]  Ms. Webb stated that she could not see any cleavage while Plaintiff was standing, but could see down her blouse when she was standing over Plaintiff King at King's work station.[8] Plaintiff proceeded to tell Ms. Webb, "I don't think my blouse is inappropriate," "This is ridiculous," and that "I was going to do something about it."[9] Plaintiff admits, "I proceeded to grab the center of my blouse and show her what cleavage was, without exposing my breast," and stated to Ms. Webb, "This is cleavage."[10]  Plaintiff King also admits that she "showed a couple of inches of cleavage."[11] However, Ms. Webb claims that she exposed her entire breasts.[12]  Ms. Webb informed Plaintiff

---

[5]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact and p. 31 of Exhibit A-3 to Defendant's Motion for Summary Judgment (p. 3 of Exhibit 2 to Plaintiff King's Deposition).

[6]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact.

[7]*See* p. 10 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 105 of Plaintiff King's Deposition).

[8]*See* Plaintiff's Brief in Support of Motion for Summary Judgment p. 2 (citing Pl. Dep. At 104-05; Webb Dep. At 27-28).

[9]*See* p. 11 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 105 of Plaintiff King's Deposition).

[10]*See* p. 31-32 of Exhibit A-3 to Defendant's Motion for Summary Judgment and Plaintiff's Response to Defendant's Statement of Undisputed Fact.

[11]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact.

[12]*See* Exhibit B to Defendant's Motion for Summary Judgment.

King that this was insubordinate behavior.[13]  Plaintiff King left Ms. Webb's office and went to Ms. Graham's office, but she was not in.[14]  Plaintiff King told Sandy Taylor, the Director of Ambulatory Services, that she knew she was in trouble because Ms. Webb told her that she was insubordinate when she flashed her breasts at her.[15]  Ms. King then pulled her blouse down in Ms. Taylor's office and showed her what she did in Ms. Webb's office.[16]

On July 20, 2005, after speaking with Ms. Webb, Ms. Brantley (an attorney who serves as Employee Relations Manager at ACH),[17] Ms. Taylor, and Ms. King, Ms. Graham determined that even if she believed King's precise version of the events, including that she did not call Ms. Webb a "liar" and did not completely expose her breasts, Ms. King's conduct warranted discharge.[18]  Ms. Graham, who made the final decision to discharge Ms. King, informed Plaintiff King that her employment was terminated for insubordinate behavior, and emphasized that her discharge was not for her attire.[19]

---

[13]*See* p. 31-32 of Exhibit A-3 to Defendant's Motion for Summary Judgment (p. 3-4 of Exhibit 2 to Plaintiff King's Deposition).

[14]*See* p. 20 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 114 of Plaintiff King's Deposition).

[15]*See* p. 21 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 115 of Plaintiff King's Deposition).

[16]*See* p. 21 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 115 of Plaintiff King's Deposition).

[17]Ms. Graham spoke with Ms. Brantley and Ms. Webb prior to her meeting with Ms. King.  *See* Exhibit B to Defendant's Motion for Summary Judgment.

[18]*See* Exhibit B to Defendant's Motion for Summary Judgment.

[19]*See* p. 25 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 121 of Plaintiff King's Deposition); Exhibit B to Defendant's Motion for Summary Judgment.

On October 4, 2005, Plaintiff King filed her Complaint in this matter alleging that her termination was the result of discrimination on the basis of race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  Plaintiff also seeks compensation for "slander, false humiliation, accusations, and mental anguish."

## II.  Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.

4

*Id.* at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988)) (citations omitted)(brackets in original).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. Rule 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## III. Discussion

### A. Discrimination Claim

In reviewing Plaintiff King's discrimination claim, we bear in mind that summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005). Nonetheless, "summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential

element of her case." *Id.*

> A plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext.

*Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (internal citations omitted)

Because King has not submitted "direct evidence" of discrimination, she must produce sufficient circumstantial evidence of illegal discrimination under the *McDonnell Douglas*[20] paradigm-by presenting a prima facie case of intentional discrimination plus sufficient evidence that one or more of ACH's proffered nondiscriminatory reasons is a pretext for unlawful discrimination. *See Griffith*, 387 F.3d at 736-37.

First, in an employment discrimination case, the plaintiff must initially present a prima facie case to survive a motion for summary judgment, which raises a rebuttable presumption of discrimination. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999). The

---

[20]The Eighth Circuit has ruled that while *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), is relevant in the context of mixed-motive jury instructions, "*Desert Palace* had no impact on prior Eighth Circuit summary judgment decisions," and therefore, the *McDonnell Douglas* framework remains the proper mode of analysis for summary judgment cases. *See Simpson*, 425 F.3d at 542 n.4.

employer must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 1135.  If the employer does this, the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual.  *Id.*  In order to establish a prima facie case of race discrimination under *McDonnell Douglas,* King must show that (1) she belongs to a protected class; (2) she was qualified for her position as a secretary; (3) she was discharged; and (4) the discharge occurred in circumstances which give rise to an inference of unlawful discrimination. *Johnson v. AT & T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005).

Assuming without deciding that King has established all four of the elements of a prima facie case, ACH has articulated a legitimate, nondiscriminatory reason for terminating King's employment.  For example, in *Kiel*, 169 F.3d at 1134-35, the Eighth Circuit upheld summary judgment in favor of an employer that stated that it terminated Kiel, a deaf employee, because he insulted the co-owner of the company by shouting "You're selfish, you're selfish," slammed his desk drawer, and made a sarcastic remark about the co-owner's recent's purchase of a new automobile in the presence of four co-workers when the employer refused to purchase a TDD, despite Kiel's apology later that day.  The Eighth Circuit has repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.  *See id.; Ward v. Procter & Gamble Paper Prods. Co.,* 111 F.3d 558, 560 (8th Cir. 1997) (employee terminated for striking a co-worker); *Price v. S-B Power Tool,* 75 F.3d 362, 365-66 (8th Cir. 1996) (employee terminated for excessive absenteeism); *Lidge-Myrtil v. Deere & Co.,* 49 F.3d 1308, 1310-11 (8th Cir. 1995) (employee not chosen for promotion because of poor relationship with co-workers and violation of company policy); *Miner v. Bi-State Dev. Agency,* 943 F.2d 912, 913-14 (8th Cir.

1991) (employee terminated for insubordination and violating various company policies).

Here, Ms. Graham, the Vice President of Ambulatory Services, made the final decision to discharge Ms. King.  She informed Plaintiff King that her employment was terminated for insubordinate behavior, and emphasized that her discharge was not for her attire.[21]

It is important to examine closely the underlying facts.  Taking these facts in the light most favorable to Plaintiff, during her visit to Ms. Webb's office Plaintiff King stated, "So you are honestly telling me that you can see down in my blouse with me standing in front of you."[22] Ms. Webb stated that she could not see any cleavage while Plaintiff was standing, but could see down her blouse when she was standing over Plaintiff King at King's work station.[23] Plaintiff proceeded to tell Ms. Webb, "I don't think my blouse is inappropriate," "This is ridiculous," and that "I was going to do something about it."[24] Plaintiff admits, "I proceeded to grab the center of my blouse and show her what cleavage was, without exposing my breast," and stated to Ms. Webb, "This is cleavage."[25]  Plaintiff King admits that she "showed a couple of inches of

---

[21]*See* p. 25 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 121 of Plaintiff King's Deposition); Exhibit B to Defendant's Motion for Summary Judgment. .

[22]*See* p. 10 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 105 of Plaintiff King's Deposition).

[23]*See* Plaintiff's Brief in Support of Motion for Summary Judgment p. 2 (citing Pl. Dep. At 104-05; Webb Dep. At 27-28).

[24]*See* p. 11 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 105 of Plaintiff King's Deposition).

[25]*See* p. 31-32 of Exhibit A-3 to Defendant's Motion for Summary Judgment and Plaintiff's Response to Defendant's Statement of Undisputed Fact.

cleavage."[26] Ms. King admits that Ms. Graham made the decision regarding her termination after interviewing Ms. Webb and herself.[27]  Ms. Graham has submitted an affidavit stating that even if she believed King's precise version of the events, including that she did not call Ms. Webb a "liar" and did not completely expose her breasts, Ms. King's conduct warranted discharge.[28]

"[T]he employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination. Title VII prohibits intentional discrimination based on certain, discreet classifications; it does not prohibit employment decisions based on other factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices." *Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (internal citations omitted).  ACH's proffered reason of insubordination based upon these facts meets the standard of a legitimate, nondiscriminatory reason for terminating King's employment.

ACH having proffered a non-discriminatory reason for terminating King, the burden shifts to King to present evidence that ACH's reason was pretextual.  *Kiel*, 169 F.3d at 1135. The showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee. *See Johnson*, 422 F.3d at 763. In essence, King is required to show a genuine issue of material fact as to whether

---

[26]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact.

[27]*See* p. 42 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 138 of Plaintiff King's Deposition).

[28]*See* Exhibit B to Defendant's Motion for Summary Judgment.

9

ACH actually fired her because of her insubordination or because of her race. *Kiel*, 169 F.3d at 1135. "[T]he ultimate question is whether the plaintiff presents evidence of 'conduct or statements by persons involved in the [employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff].'" *Id.* King may prove pretext either directly by showing that her employer was more likely motivated by a discriminatory reason or indirectly by showing that her employer's explanation is unworthy of credence. *See Rose-Maston*, 133 F.3d at 1108.

In support of her assertion of discrimination, King makes allegations of disparate treatment. Specifically, King asserts in her Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment (Docket #26) that four employees and one doctor who dressed in a similar fashion were not disciplined at all. King also asserts that a white typist was absolved from discipline by Ms. Webb because she was "so sweet and so Christian," while Plaintiff King was "disciplined" for her errors. Instances of disparate treatment can support a claim of pretext, but King must prove that she and the other employees were similarly situated in *all* relevant respects. *Ward*, 111 F.3d at 560-61 (emphasis added). "Employees are similarly situated when they 'are involved in or accused of the *same offense* and are disciplined in different ways.'" *Id.* Thus, it is Ms. King's burden to produce specific, tangible evidence showing a disparity in the treatment of similarly situated employees. *Rose-Maston*, 133 F.3d at 1109 n.4.

First, Ms. King states that four employees and one doctor dressed in a similar fashion and were not disciplined at all. However, Ms. King alleges that the only person that harbors racial

animus against her because she is African-American is Ms. Webb.[29]  When asked what Ms.

Webb ever did or said to indicate that she harbored racial animus against African-Americans,

Ms. King only cites to the comment that Jo McCallie is "sweet and Christian" (which will be

addressed below), and the issue regarding Tammy Taylor and Tamara Hargrove wearing scrubs.[30]

 Taking the facts in light most favorable to Ms. King, Ms. King reported to Ms. Webb that

Tamara Hargrove, Dr. Bower's secretary, wore green operating scrubs every Friday, not because

the scrubs were revealing, but because Ms. King believed that secretaries were not supposed to

wear them.[31]  Ms. King also said that Ms. Webb did not speak to Tammy Taylor about her

scrubs.[32]  However, Ms. King admits that she does not actually know whether Ms. Webb ever

talked to Tammy Taylor or Tamara Hargrove about wearing scrubs.[33] Ms. King also states that

"one physician, Dr. Bower, for instance, can say, 'Oh, it's okay for my secretary to wear scrubs,

but another physician can say, No, it's not.'  But ACH policy says differently," but admits that

she had never asked to wear scrubs because she is "not a scrubs person."[34]  While Ms. King

---

[29]*See* p. 39 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 136 of
Plaintiff King's Deposition).

[30]*See* p. 40 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 137 of
Plaintiff King's Deposition).

[31] *See* p. 54-56 of Exhibit A-1 to Defendant's Motion for Summary Judgment (p. 77-79 of
Plaintiff King's Deposition).

[32] *See* p. 33 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 129 of
Plaintiff King's Deposition).

[33]*See* p. 57 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 153 of
Plaintiff King's Deposition).

[34]*See* p. 69-70 of Exhibit A-1 to Defendant's Motion for Summary Judgment (p. 92-93 of
Plaintiff King's Deposition).

asserts that ACH policy does not allow secretaries to wear scrubs, ACH policy only states:

> Employees will maintain personal cleanliness, good grooming and appropriate dress while on duty.  Clothing should reflect a business-like/professional appearance.
>
> . . .
>
> Specific uniforms may be required by individual department policies, with approval of the appropriate administrative staff member.  The department will be responsible for color selection.  When an individual's employment terminates, the department will also be responsible to see that hospital-owned uniforms are returned.  Hospital-owned scrub suits are not to be worn out of the hospital.[35]

ACH policy states no prohibition against wearing scrubs, but even if an oral policy against secretaries wearing scrubs exists, Ms. King cannot affirmatively state that Ms. Webb did not speak to Ms. Taylor or Ms. Hargrove.  In fact, by Ms. King's own statements, it appears that enforcement of any policy regarding the wearing of scrubs depends on the physician for whom the secretary works.

Second, Ms. King also states that she has seen Ms. McCallie's, Ms. Taylor's, Ms. Webb's, Ms. Francis Knight's, Ms. Tamara Hargrove's, and Dr. Buckmiller's[36] cleavage, and equates seeing cleavage with dressing provocatively.[37]  Ms. King states that sometime in 2005, Tammy Taylor had a blouse that showed cleavage, but she was unaware of whether Ms. Webb

---

[35]*See* p. 47 of Exhibit A-1 to Defendant's Motion for Summary Judgment (Exhibit 11 to Plaintiff King's Deposition).

[36]As Dr. Buckmiller is not supervised by Ms. Webb, and Ms. Webb is not responsible for reprimanding Dr. Buckmiller on her clothing, Dr. Buckmiller and Ms. King are not similarly situated.

[37]*See* p. 63-65 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 159-61 of Plaintiff King's Deposition).

saw her or if anyone reported to Ms. Webb that Ms. Taylor's blouse showed cleavage.[38]  Ms.

King points to no specific instance in which Ms. Webb, or any other supervisory official, was

personally aware, or had someone report to her, these specific alleged violations of the dress

code.  If the superiors of these women were unaware of the alleged dress code violations, it

cannot be said that they are in the same position as Ms. King, as Sandra Steinert, the Project

Coordinator for Ambulatory Care Services, complained to Ms. Webb that Ms. King's blouse was

too low cut.[39]

Furthermore, it is clear that when Ms. Webb was made aware of complaints regarding

violations of the dress code, she handled such matters by bringing the complaint to the

employee's attention and requesting that the employee refrain from future violations, as she

initially did with Ms. King, regardless of the race of the individual.  Ms. Webb recalls several

instances in which she received complaints about individuals, other than Ms. King, violating of

the dress code.[40]  At some point between 1998 and 2000, after receiving a complaint that a male

nurse was wearing white jeans instead of scrub pants to work, Ms. Webb visited with him and he

began wearing appropriate scrubs.[41]  Around 2001 or 2002, Ms. Webb received a complaint that

a white nurse was wearing scrubs that were too thin, so that a person could visualize her

---

[38]*See* p. 61 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 157 of
Plaintiff King's Deposition).

[39]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact.

[40]*See* p. 1-4 of Exhibit A to Defendant's Brief in Reply to Response to Motion for
Summary Judgment (p. 13-16 of Ms. Webb's Deposition).

[41]*See* p. 1-2 of Exhibit A to Defendant's Brief in Reply to Response to Motion for
Summary Judgment (p. 13-14 of Ms. Webb's Deposition).

undergarments.[42]  She discussed the matter with the nurse, and the nurse no longer wore those

scrubs.[43]  When Ms. Webb received a complaint that a white employee's blouses were

inappropriately revealing cleavage, she discussed the issue with the employee, who was very

apologetic.[44]  Ms. Webb has not observed any further problems with that employee.[45]  Ms. King

agrees that reasonable people can disagree about what is and what is not appropriate for a

professional office environment, and when such a disagreement occurs, the supervisor has the

"last say."[46]  Ms. King also states that Ms. Webb talked to her approximately five times in five

months about her attire.[47]

Finally, King's assertions regarding the "so sweet and so Christian" statement and alleged

disparate treatment regarding typing mistakes is insufficient to show a disparity in the treatment

of similarly situated employees.  In this situation, Dr. Buckmiller, a person that Ms. King does

not allege harbors any racial animus against her,[48]  asked Ms. Webb to talk to Ms. King after Dr.

---

[42]*See* p. 2 of Exhibit A to Defendant's Brief in Reply to Response to Motion for Summary Judgment (p. 14 of Ms. Webb's Deposition).

[43]*See* p. 3 of Exhibit A to Defendant's Brief in Reply to Response to Motion for Summary Judgment (p. 15 of Ms. Webb's Deposition).

[44]*See* p. 3-4 of Exhibit A to Defendant's Brief in Reply to Response to Motion for Summary Judgment (p. 15-16 of Ms. Webb's Deposition).

[45]*See* p. 4 of Exhibit A to Defendant's Brief in Reply to Response to Motion for Summary Judgment (p. 16 of Ms. Webb's Deposition).

[46] *See* p. 49-50 of Exhibit A-1 to Defendant's Motion for Summary Judgment (p. 72-73 of Plaintiff King's Deposition).

[47] *See* p. 58 of Exhibit A-1 to Defendant's Motion for Summary Judgment (p. 81 of Plaintiff King's Deposition).

[48]*See* p. 39 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 136 of Plaintiff King's Deposition).

Buckmiller wrote Ms. King an e-mail about spelling errors in her dictation, and Ms. King replied

back in an e-mail stating that Dr. Buckmiller needed to talk to Jo McCallie because most of the

mistakes were Ms. McCallie's.[49]  Dr. Buckmiller wrote back stating that the errors she was

addressing were the ones with Ms. King's initials.[50]  Plaintiff admits that Dr. Buckmiller did not

raise this issue because of her race.[51]  Once again, when asked what Ms. Webb ever did or said to

indicate that she harbored racial animus against African-Americans, Ms. King only cites to the

comment that Jo McCallie, a white typist, is "so sweet and so Christian" and to the issue

regarding Tammy Taylor and Tamara Hargrove wearing scrubs, discussed above.[52]  Ms. King

states that she is unsure as to why Ms. Webb made this statement, and it could be because Ms.

Webb did not think Ms. King was Christian, did not think she was sweet, because she is black,

because she is outspoken, or because of the way she dressed.[53]  Ms. King has not alleged that Ms.

Webb made a comment about her race or any other direct negative comment about her in that

conversation, but states that one possible explanation for Ms. Webb's comment is that Ms. King

is African-American.  These facts do not meet Ms. King's burden of producing specific, tangible

---

[49] *See* p. 58-59 of Exhibit A-1 to Defendant's Motion for Summary Judgment (p. 81-82 of Plaintiff King's Deposition).

[50] *See* p. 58-59 of Exhibit A-1 to Defendant's Motion for Summary Judgment (p. 81-82 of Plaintiff King's Deposition).

[51] *See* p. 59 of Exhibit A-1 to Defendant's Motion for Summary Judgment (p. 82 of Plaintiff King's Deposition).

[52]*See* p. 40 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 137 of Plaintiff King's Deposition).

[53]*See* p. 65 of Exhibit A-1 to Defendant's Motion for Summary Judgment (p. 88 of Plaintiff King's Deposition).

evidence showing a disparity in the treatment of similarly situated employees, and therefore, these allegations do not support her claim of pretext.

It bears repeating that Ms. King was discharged <u>for insubordinate conduct</u>, not her inappropriate attire. Therefore, the similarly situated employees for this analysis would be white employees who displayed insubordinate conduct and were not fired. Ms. King offered the existence of no such incidents.

King has not pointed to any other conduct or statements by ACH officials that would permit a reasonable jury to find that insubordination was a pretext for her termination. Nor did she demonstrate that ACH supervisors disciplined non-minority employees less severely for insubordinate conduct. In fact she was not aware of any employee who "stood up to Ms. Webb" in the way that she did when Ms. Webb talked to them about any work-related issues.[54] Furthermore, Ms. King admits that Ms. Graham made the decision regarding her termination after interviewing Ms. Webb and herself,[55] but does not allege that Ms. Graham harbors any racial animus against her.[56] In short, there is simply no evidence that discrimination was a motivating factor in King's termination. In light of King's failure to establish a genuine factual issue on pretext, summary judgment on the discriminatory discharge claim is granted.

---

[54]*See* p. 5 of Exhibit A-3 to Defendant's Motion for Summary Judgment (p. 171 of Plaintiff King's Deposition).

[55]*See* p. 42 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 138 of Plaintiff King's Deposition).

[56]*See* p. 39 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 136 of Plaintiff King's Deposition).

**B.  Slander**

In Ms. King's Complaint, she alleges, "Since my termination, I have received calls from people saying that they heard I was fired for exposing my breast to Tammy Webb, this is slander and humiliating.  I have had a hard time dealing with this situation, I have lost weight and it has affected my home life deeply, sleeping and eating have been very difficult for me due to the fact that these people have slandered my name and what they are saying is not true."  The only case Plaintiff cites to in her Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment (Docket #26) regarding defamation is *Reese v. Haywood*, 235 Ark. 442 (1962).  In Plaintiff's Brief in Support, she asserts a claim for slander *per se* alleging that Ms. Webb, her supervisor at ACH, has accused Plaintiff of being a flasher and of violating Arkansas' indecent exposure statute.  Contrary to the standard expressed in *Reese*, the Arkansas Supreme Court, in *United Ins. Co. of America v. Murphy*, 331 Ark. 364, 370-71 (1998), found that a plaintiff in a defamation case must prove reputational injury in order to recover damages, and overruled all prior decisions inconsistent with that opinion, including *Reese*.  Furthermore, in *Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 459, 47 S.W.3d 866, 886 (2001), the Court recognized that "defamation *per se* . . . was abolished in *United Ins. Co of America v. Murphy*."  Therefore, Plaintiff's slander claim may only be analyzed under the traditional analysis for defamation.

In support of its argument for summary judgment on the defamation claim, Defendant asserts that Plaintiff's statement that a woman named Billie Redd told Plaintiff that she heard Plaintiff had flashed Webb is hearsay, barred by Fed. R. Evid. 801 and 802.  Defendant states, "Clearly the truth of the matter asserted is what Redd allegedly heard, not the act itself.  Without admissible testimony by Redd, summary judgment is proper for that reason alone."  In *Wal-Mart*

*Stores, Inc. v. Dolph*, 308 Ark. 439, 443, 825 S.W.2d 810, 812 (1992), the Arkansas Supreme

Court directly addressed this issue and found that the testimony was not hearsay.  There, the

plaintiff testified that her sister's mother-in-law had been told by one of the Wal-Mart employees

that the plaintiff had been caught shoplifting.  *Id.*  The Court found that the testimony was not

offered to prove the truth of what was said, but to prove the fact that it was said, which then

became some evidence of publication, and therefore, the testimony was not hearsay.  *Id.* (citing

*Luster v. Retail Credit Company*, 575 F.2d 609 (8th Cir.1978) (affirming the trial court's

rejection of Defendant's hearsay objection when plaintiff used the testimony of a third-party

insurance agent who heard from a deceased agent that an insurance firm believed that the credit

report supplied by defendant implied arson to prove publication because the trial court gave a

limiting instruction and the testimony was admitted solely to prove the fact that the words were

said, not to prove that they were true).  *See also United Ins. Co. of America v. Murphy*, 331 Ark.

364, 373-74, 961 S.W.2d 752, 758 (1998) (declining to overrule *Wal-Mart Stores, Inc. v. Dolph*)

(affirming the trial court's ruling allowing plaintiff's witnesses to testify that persons not called

at trial said that Burcham said that the plaintiff was a thief).  Based upon the prior rulings of the

Arkansas Supreme Court and the Eighth Circuit, summary judgment may not be granted on

Plaintiff's slander claim on the basis of hearsay.

The following elements must be proved to support a claim of defamation: (1) the

defamatory nature of the statement of fact; (2) the statement's identification of or reference to the

plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the

publication; (5) the statement's falsity; and (6) damages.  *Northport Health Servs, Inc. v. Owens*,

356 Ark. 630, 641, 158 S.W.3d 164, 171 (2004).  The main question is whether the

communication or publication was reasonably calculated to cause harm to Ms. King's reputation. *Id.* Arkansas law recognizes a qualified privilege in cases of employers and supervisory employees. *Puckett v. Coo*, 864 F.2d 619, 621-22 (8th Cir. 1989). A defamation claim will fail under Arkansas law unless there is an abuse of privilege or communication to a non-privileged third party. *Id.* An allegedly defamatory communication may be held to fall under a qualified privilege when the statement is made in good faith and in reference to a subject matter in which the communicator has an interest or duty and to a person having a corresponding interest or duty. *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 735, 74 S.W.3d 634, 653 (2002). However, even if a statement falls under the qualified privilege, if a person making the statement steps outside the *bounds of the privilege or abuses the privilege, the qualified privilege is lost. Navorro-Monzo v. Hughes*, 297 Ark. 444, 450, 763 S.W.2d 635, 637 (1989) (emphasis added). The qualified privilege does not extend to publication of statements that have no relation to the interest entitled to protection and is lost if the publication is not made for the purpose of furthering common interest. *Id.* at 450. The qualified privilege may be lost by the publisher of a defamatory statement if it is abused by excessive publication, if the statement is made with malice, or if the statement is made with a lack of grounds for belief in the truth of the statement. *Superior Federal Ban v. Mackey*, 84 Ark. App. 1, 15, 129 S.W.3d 324, 333 (Ark. Ct. App. 2003).

In *Pighee v. L'Oreal USA Products*, 351 F. Supp. 2d 885, 895 (E.D. Ark. 2005), the plaintiff stated that he told only the management officials of the defendant, L'Oreal, who had a need to know about the allegations. There, the plaintiff testified that "no one told him that they learned of the allegations from a L'Oreal official or manager, but attempted to establish communication to a non-privileged third party based on the fact that 'people on the floor [of the

19

L'Oreal facility knew] about it.'" *Id.*  The plaintiff argued that since the complainants wished to remain anonymous, it seemed more likely than not that the other employees were told by some L'Oreal official.  *Id.*  The district court granted L'Oreal summary judgment on the basis of a lack of evidence that L'Oreal abused its qualified privilege or communicated the information to a non-privileged third party since the plaintiff cited "no law that would allow this Court to find such unsubstantiated and speculative assertions sufficient to create a genuine issue of material fact on the issue."  *Id.*

Here, Plaintiff asserts that Ms. Webb exceeded any privilege involved by sharing the allegation that Ms. King flashed her breasts in such a way that it became known to Ms. Billie Redd, the Patient Information Coordinator ("PIC") over the General Pediatric Clinic, and Ms. Carol Van Hooks, whom Ms. King believes is now a PIC at ACH.[57]  Ms. King asserts that she saw Billie Redd at the mall, and Ms. Redd stopped her and said that she heard that Ms. King had flashed her breasts to Tammy Webb.[58]  Plaintiff King also states in her deposition that Ms. Carol Van Hooks told her that she had heard that Plaintiff had flashed her breasts, "which means somebody said something to them."[59]  However, Ms. King admits that she herself has repeated the allegation that she flashed Ms. Webb to no less than six people, including her lawyer, her husband, her sister Florence Hood, her mother, intake at the unemployment office, and the Equal

---

[57]According to Ms. King's Complaint, a Secretary III, Ms. King's position at the time she was terminated, is superior to a PIC, as Ms. King was promoted from a PIC to a Secretary III.

[58]*See* p. 59 of Exhibit A-2 to Defendant's Motion for Summary Judgment (p. 155 of Plaintiff King's Deposition).

[59]*See* p. 17 of Exhibit A-3 to Defendant's Motion for Summary Judgment (p. 187 of Plaintiff King's Deposition).

Employment Opportunity Commission.[60]  Also, Ms. King was unsure of whether she spoke with

Jo McCallie after July 19, 2005 about what happened in Ms. Webb's office or what Ms. Webb

says happened in her office.[61]  Furthermore, Ms. King testified that she had no idea who told Ms.

Redd and Ms. Van Hooks that she had flashed her breasts in Ms. Webb's office,[62] but attempts to

establish communication to a non-privileged third party based on the fact that Ms. Redd and Ms.

Van Hooks told her that they had heard that Plaintiff had flashed her breasts, "which means

somebody said something to them."[63]

        As in *Pighee*, Ms. King cites no law that would allow this Court to find such

unsubstantiated and speculative assertions sufficient to create a genuine issue of material fact on

the issue.  Ms. King has failed to produce any evidence of the third or fourth elements of a prima

facie case of slander,  publication of the statement by the defendant or the defendant's fault in the

publication.  She has not offered any evidence regarding how or from whom Ms. Redd and Ms.

Van Hooks heard about the allegations surrounding the incident in Ms. Webb's office.

Furthermore, Plaintiff admits that she "has no admissible evidence that the statement about

exposing her breasts was made by anyone for whose conduct ACH would be liable."[64]  Based on

---

        [60]*See* p. 18-21 of Exhibit A-3 to Defendant's Motion for Summary Judgment (p. 188-91 of Plaintiff King's Deposition).

        [61]*See* p. 23 of Exhibit A-3 to Defendant's Motion for Summary Judgment (p. 193 of Plaintiff King's Deposition).

        [62]*See* p. 17 of Exhibit A-3 to Defendant's Motion for Summary Judgment (p. 187 of Plaintiff King's Deposition).

        [63]*See* p. 17 of Exhibit A-3 to Defendant's Motion for Summary Judgment (p. 187 of Plaintiff King's Deposition).

        [64]*See* Plaintiff's Response to Defendant's Statement of Undisputed Fact, ¶ 41.

21

the lack of evidence that ACH published the statement, is at fault in the publication of the statement, or abused its qualified privilege by communicating the information to a non-privileged third party, ACH is entitled to summary judgment on this claim.

## CONCLUSION

FOR THE REASONS STATED ABOVE, IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment (Docket #20) be, and is hereby, GRANTED .

IT IS SO ORDERED THIS 27th day of September, 2006.

_/s/ Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE